[Civ. No. 3472.   Fourth Dist.   Dec. 4, 1947.]

C. D. DICKEY, JR., Appellant, v. LASELLE THORN-BURGH et al., Respondents.

724

Forrest A. Betts and William J. Currer, Jr., for Appellant.

C. F. Jorz for Respondents.

GRIFFIN, J.—Action for damages for claimed wrongful act resulting in death. Decedent, Jack Dickey, aged 20, son of plaintiff C. D. Dickey, Jr., had been working for the Lake Arrowhead Yacht Club. On September 5, 1942, plaintiff was a regular member of the club and owned a Criss-craft 100 horsepower 19-foot motorboat named "Doc." Defendant, Laselle Thornburgh, husband of defendant Emily Thornburgh, was also a member thereof and owned a similar 125 horsepower Criss-craft motorboat named the "Lazy M," and both he and plaintiff were permittees and authorized to drive said boats on Arrowhead Lake.

About 9 p. m., after dark, on September 5, 1942, plaintiff's motorboat was being operated by his son Jack, in a general

northwesterly direction from the boat landing toward the northerly shore of the lake. At a certain described point the motorboat of defendants, operated by defendant Richard Thornburgh, son of Laselle Thornburgh, aged 16, approached the motorboat of plaintiff. The two motorboats collided. As a result of this, plaintiff's boat sank to the bottom of the lake. Jack Dickey received fatal injuries and his body was subsequently found in the lake. The Thornburgh boat likewise sank to the bottom. One of the passengers was killed but the remaining passengers were rescued before drowning. This action followed.

Plaintiff claimed negligence of defendant Richard Thornburgh, the one remaining defendant in the case, who denied the allegations in the complaint and claimed contributory negligence on the part of plaintiff and also on the part of the deceased, Jack Dickey. The jury found for defendant. This appeal followed.

Plaintiff first claims error of the trial court in failing to instruct the jury on the doctrine of "last clear chance." To determine this question it will be necessary to relate a résumé of the evidence bearing on that issue.

The deposition of Robert McIntosh, aged 17, was read into evidence. He was the only passenger riding with the deceased, Jack Dickey. He testified that Jack and he left the boat dock at the village yacht harbor shortly before 9 p. m.; that Jack turned on all the lights on the boat; that a partitioned bow light (green to starboard and red to port) with a white stern light located on the upper end of an 18-inch masthead or flagpole inserted in a socket were on the boat at the time and were lighted; that the evening was "very dark" and no moon was shining; that the lake was comparatively calm; that they swung the boat around and "proceeded" to go in a "direction towards the north shore"; that as they pulled out of the dock he, Robert, put his feet up under the light on the dashboard and remarked "that the shoe shine boy had given me an excellent shine"; that he did not observe whether Jack was looking at his shoes or not; that he, Robert, was looking for other boat drivers on the lake but did not see any; that his speedboat was then planing and going about 32 miles per hour; that Jack was sitting down driving and looking through the windshield; that about one and one-half minutes later they changed their course from north to east on account of clearing rocks at Movie Point;

that they then changed their course again and started to go west; that he did not "see the Thornburgh boat prior to the accident at all" and "the next thing I remember I woke up . . . in the water about 250 feet from shore"; that as he was swimming around he could not see who the people were but he recognized Dick Thornburgh's voice and they asked each other "what had happened and how it happened and neither of us could explain it."

Plaintiff was out of the state and did not testify at the trial. Three living guests in the Thornburgh boat gave their depositions in an action instituted by one of them against Thornburgh. These depositions were read into evidence in this case, by stipulation.

William Slaby, aged 19, riding in the Thornburgh boat, testified that his party of four was invited to ride with Richard Thornburgh to the village; that about 100 yards from shore Richard started driving about 40 miles per hour "in circles and in a zig zag course back and forth across the lake . . . to give everyone a thrill"; that it was "very dark"; that they heard a man's voice cry out; that "there was not very much to see only I thought I could see this boat almost directly in front and to our right . . . it couldn't have been very far, and then there was a collision"; that there didn't "seem to be any change in the speed, maneuvering and course of the (Thornburgh) boat from the time he heard the outcry until the impact . . . there was not any time for change in speed"; that Thornburgh said at one time that he "couldn't see very good when he was driving"; that he didn't know whether it was darkness or spray from the boat on the windshield but that Richard stood up for a while while driving the boat; that they were cruising about 200 yards from the shore of the lake at the time of the collision.

The depositions of other passengers corroborated the testimony related by this witness. One witness testified that she was riding in the front seat and saw the lights on plaintiff's boat "about 18 to 20 feet before they hit it"; that at that time one passenger cried out to Richard: "Oh, my God"; that Richard was looking out his side of the boat; that as she remembered it they were making a left turn at the time and they collided "kind of at an angle."

Considerable evidence was given by other witnesses as to the condition of the two boats after being removed from the bottom of the lake. Pictures were in evidence showing the

damage and their condition. Opinions were given as to the possible position of the boats at the time of the collision. Also, the throttles of both boats were found in a nearly wide-open position when recovered from the 115-foot depth of water. The rear light mast on Thornburgh's boat was found in the bottom of his boat. The rudders on both boats were found turned "hard to the right." The Dickey boat, from the pictures, appeared to be cut from its left side about at the driver's seat to its bow, by the cutting portion or the bow and right front portion of the Thornburgh boat.

Richard Thornburgh testified generally that it was a "very dark night"; that he was driving his guests in the boat around the lake; that he did not "spin" or "zig zag" with the boat, but only turned it in and out "in following around the shore line"; that he was traveling about 30 to 32 miles per hour and "didn't see any boat. . . . I kept on my course until just the instant before the collision, I didn't notice, I didn't know where it came from but it was there, a boat (with lights), not quite the distance to the end of the room— somewhere near 20 feet—and my first reaction was to turn the wheel as fast as I could and I did. I turned the wheel, but it didn't have enough time, and we collided—it was almost head-on—it was going toward the northwest . . . and I was going southeast"; that there were shore lights of the same color burning; that the lights on his boat were burning too; that he "wouldn't say which one," the red or green light on the Dickey boat, was more visible to him when he first saw it.

There was received in evidence, without objection, "Rules of the Road" on Lake Arrowhead, prescribed by Lake Arrowhead Yacht Club, and "Boat Regulations on the Waters of Lake Arrowhead, Issued in Conformity of Boat Permits," as well as San Bernardino County Ordinance No. 449. The rules and boat regulations of the lake contained the following provisions:

"A. When power boats are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; in other words, pass to the right in this situation.

"B. Between sundown and sunrise (the hours of darkness) motor boats approaching head on, or nearly so, shall pass red light to red light (that is, on the right); approaching each other from the direction other than head on, that is when the RED LIGHT of the approaching boat is mainly

visible, the boats shall pass red to red or to the right of each other; when the GREEN LIGHT is mainly visible they shall pass green to green or to the left of each other.

"C. When two power boats are approaching each other at right angles, or obliquely, so as to involve risk of collision, other than when one boat is overtaking another, the power boat which has the other on her port side shall hold her course and speed; the power boat which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other boat, or if necessary to do so, slacken her speed or stop or reverse. In other words, unless otherwise specified, the boat approaching from the right has the right of way."

Rule 9 thereof prescribed that "A strip surrounding the lake bounded by a line 300 feet out from shore shall constitute a safety zone inside of which the maximum speed at all times shall be limited to 10 miles per hour. . . . A speeding fairway is established outside the 300 foot line . . . within which area the speed limit of all craft shall be governed by the common rules of safety and consideration for lives and comfort of all other traffic but not to exceed 20 miles per hour. . . ."

The county ordinance, in effect at that time, provided, in section 2 thereof:

"It shall be unlawful for any person . . . within the County of San Bernardino . . . outside of municipal corporations to operate a motor propelled boat in excess of twelve miles per hour between the hours of five o'clock p. m. to ten o'clock a. m. and/or within two hundred and fifty (250) feet of any boat not propelled by motor or any boat not in motion.

"Section 3. This ordinance is hereby declared to be an emergency measure for the reason that it is necessary for the immediate preservation of the public peace, health and safety; for the reasons that the peace of the citizens of the County of San Bernardino is being disturbed daily by the use of unmuffled motor boats and that the safety and peace of persons using the lakes of said county are daily endangered by the operation of motor boats at a fast rate of speed near boats not in motion."

It is argued that plaintiff was entitled to have the jury instructed on his theory of the case and that the refusal of the trial court to give the proffered instruction on the doctrine of last clear chance was error because the evidence showed that deceased, Jack Dickey, by his own negligence,

placed himself in a position of danger; that he was unaware of the impending danger and that defendant had actual knowledge of plaintiff's perilous situation and had a clear opportunity to avoid the accident by the exercise of ordinary care but did not do so, citing such cases as *Girdner* v. *Union Oil Co.*, 216 Cal. 197, 203 [13 P.2d 915], and cases therein correlated.

It seems clear to us, in view of the evidence presented, that the trial court was fully justified in refusing to give such an instruction. The evidence is most convincing that it was a "dark" or "very dark" night; that there was no substantial evidence that defendant had actual knowledge of the perilous situation of deceased prior to the time he was within 18 to 20 feet of plaintiff's boat, or that after acquiring such knowledge he had a clear opportunity to avoid the accident and could have done so by the exercise of ordinary care. In fact, all the substantial evidence points to the opposite conclusion. The facts in the instant case are clearly distinguishable from the facts in the cases cited by defendant and bring them well within the rule laid down in *Bramble* v. *McEwan,* 40 Cal. App.2d 400, 412 [104 P.2d 1054]; *Palmer* v. *Tschudy,* 191 Cal. 696 [218 P. 36]; and *Jones* v. *Yuma Motor F. Terminal Co.,* 45 Cal.App.2d 497 [114 P.2d 438]; *Ravettino* v. *City of San Diego,* 70 Cal.App.2d 37 [160 P.2d 52]; *Dalley* v. *Williams,* 73 Cal.App.2d 427 [166 P.2d 595].)

The next complaint is directed toward an instruction, given by the court, to the effect that a violation of an ordinance is negligence *per se,* and that if the jury found from a preponderance of the evidence that plaintiff's son violated the county ordinance in evidence in "traveling in excess of the speed limit therein set out under the conditions therein prescribed" he would be negligent as a matter of law, and that if the collision was proximately caused "by a violation of the ordinance on the part of plaintiff's son and Richard Thornburgh with respect to speed then plaintiff cannot recover damages." Following this another instruction was given as follows:

"Conduct which is in violation of a county ordinance such as has been introduced in evidence constitutes negligence per se. This means that if the evidence supports a finding, and you do find, that a person did so conduct himself, it requires a presumption that he was negligent. However, such

presumption is not conclusive. It may be overcome by other evidence. . . .

"However, in this action, a violation of law is of no consequence unless it was a proximate cause of or contributed in some degree as a proximate cause, to the accident and death complained of."

This instruction was followed by a proper and more specific instruction, requested by both plaintiff and defendant, on the subject of negligence, contributory negligence, proximate cause and burden of proof. As modified, the court instructed the jury, at plaintiff's request, that the issues were

"First: Was the defendant Richard Thornburgh negligent? If you answer that question in the negative, you will return a verdict for the defendant Richard Thornburgh. If you answer it in the affirmative, you have a second issue to determine, namely: Was the negligence of Richard Thornburgh a proximate cause of the death of Jack Reeves Dickey and of damages, if any, to the plaintiff, C. D. Dickey, Jr? If you answer that question in the negative, plaintiff is not entitled to recover, but if you answer it in the affirmative, you then must find on a third question: Was the plaintiff C. D. Dickey himself negligent, as alleged in the complaint, or was Jack Reeves Dickey negligent as alleged? If, after having found in plaintiff's favor on the other two issues you also find that neither C. D. Dickey, Jr. nor Jack Reeves Dickey was negligent, you must then fix the amount of plaintiff's damages and return a verdict in his favor. If, however, you find that either plaintiff was negligent or that Jack Reeves Dickey was negligent, as alleged, then you must determine a fourth issue, namely: Did such negligence on the part of either C. D. Dickey, Jr. or Jack Reeves Dickey contribute in any degree as a proximate cause of the accident? If you find that negligence on the part of C. D. Dickey, Jr. or on the part of Jack Reeves Dickey, as alleged, contributed in any degree as a proximate cause of the accident, your verdict must be for defendant, but if you find that it did not, and you previously have found that there was negligence on defendant's part which proximately caused plaintiff's injury, you must then fix the amount of plaintiff's damages and return a verdict in his favor."

In this connection it is argued by plaintiff that the instruction adopting the ordinance by reference is confusing and ambiguous because one section of the ordinance uses the

words "and/or," which expression has been condemned by our Supreme Court in *In re Bell,* 19 Cal.2d 488 [122 P.2d 22]. We concur in the conclusion there reached. The ordinance here involved is subject to criticism, but it here appears that in neither event was the ordinance unconstitutional or invalid, i. e., operating a motor-propelled boat in excess of 12 miles per hour between 5 p. m. and 9 a. m., or within 250 feet of any boat not propelled by motor, or any boat not in action. A breach of any one of those provisions would constitute a violation of law. The court interpreted the ordinance as applicable to the conduct of both plaintiff's son and Richard Thornburgh, and that if there was a violation of the ordinance introduced in evidence it would be negligence *per se.* The question whether the ordinance had been violated "under the conditions therein prescribed" was left to the jury to determine. The ordinance was received in evidence without objection. Apparently plaintiff was relying upon its provisions to assist him in establishing negligence of the defendant. In this connection plaintiff alleged in his complaint that the Thornburgh boat was being operated in a careless manner and in violation of the rules of navigation applicable to said waters. We do not see how plaintiff may now complain about the instruction, as given. (*Holahan* v. *McGrew,* 111 Cal.App. 430 [295 P. 1054].)

Complaint is next made by plaintiff that the court emphasized, by reiterating and repeating, to his prejudice, instructions in reference to "contributory negligence," and the repetitious use of the words "The mere happening of the accident is not negligence," and "then you must find for defendants."

Counsel refers to these several instructions merely by setting forth in his brief the number of such instructions involving these passages. Suffice to say in this respect that an examination of the reporter's transcript discloses that many of the instructions on the subject were offered by plaintiff and were given by the court. Others were offered by defendant. The trial court gave some instructions on the subject to clearly present the issues to the jury. Our examination of the instructions given would not make them subject to the interpretation placed thereon by counsel for plaintiff, i.e., that by repeating the general proposition in the several instructions as given that the jury gained the impression that the judge "expected" it to find contributory negligence on the

part of plaintiff. In fact, the trial judge gave, at plaintiff's request, an instruction that "If in these instructions, any rule, direction or idea be stated in varying ways, no emphasis thereon is intended by me, and none must be inferred by you. For that reason you are not to single out any certain sentence or any individual point or instruction and ignore the others but you are to consider all of the instructions as a whole and regard each in the light of all of the others."

■ Error is claimed in giving an instruction that:

"In weighing the conduct of . . . Thornburgh to decide whether or not he was negligent, you must bear in mind that the law required of Richard Thornburgh that degree of care which a boy of the same age, *to wit fifteen years,* would use under the same or similar circumstances, in the exercise of ordinary care. In weighing the conduct of the deceased, Jack Dickey, the plaintiff's son, the law required of him that degree of care that a boy of the age of twenty years would exercise under the same or similar circumstances."

Richard Thornburgh testified that he was 16 years of age at the time of the accident. If the instruction was limited to a boy of 15 years of age, to that extent it would be erroneous and not a proper measure of conduct of a boy of the age of 16 years. It appears that *plaintiff* may have led the court into that error. In his complaint he inferentially alleges that Richard was of the age of *15 years* or younger at the time of the accident. In his opening statement to the jury, counsel for plaintiff stated: "I might say here it is my understanding . . . Richard, at the time of the accident was about *15 years of age.*" He again referred to Richard as being *15 years of age* or younger, in a colloquy with the court in the presence of the jury, after which the court read the charge in the complaint as above mentioned. The record itself discloses that Richard did testify that he was then (at the time of trial) 18 years of age, but did testify that he was 16 at the time of the accident. However, on cross-examination by counsel for plaintiff, he testified that he had been going up to the lake from the time he was 11 years old until he was approximately 15. The exact date of birth of Richard was not brought out in the record. If his age was 16 years at the time, the instruction nevertheless covered the situation. It required him to use that degree of care "which a boy of the same age . . . would use." We do not believe that by the use of the added words, "to wit fifteen years," the jury was misled as

to the degree of care required, or that the plaintiff can, under the circumstances, claim prejudicial error in this respect.

We have examined the entire record, including the instructions given and refused and find no error that would not be cured by the application of article VI, section 4½ of the Constitution.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied December 22, 1947, and appellant's petition for a hearing by the Supreme Court was denied January 29, 1948.